# Illinois Official Reports

## Appellate Court

---

### *Benz v. Department of Children & Family Services*, 2015 IL App (1st) 130414

---

| | |
|---|---|
| Appellate Court Caption | MICHAEL T. BENZ and LYNN M. BENZ, Plaintiffs-Appellants, v. THE DEPARTMENT OF CHILDREN AND FAMILY SERVICES, RICHARD CALICA, DIRECTOR OF CHILDREN AND FAMILY SERVICES, and STEVEN JAFFE, not individually but solely as Guardian Ad Litem for J.C., Defendants-Appellees. |
| District & No. | First District, Fifth Division<br>Docket No. 1-13-0414 |
| Filed | February 6, 2015 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from the circuit court's order affirming the determination of the Department of Children and Family Services that a minor who had been removed from the plaintiff foster parents' home should remain with a relative, the appellate court found that the plaintiffs' due process claims were moot where the relative's adoption of the minor became finalized and the public interest exception to the mootness doctrine did not apply. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 11-CH-43956; the Hon. Neil Cohen, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

Michael T. Benz, of LaGrange, and Law Offices of Theodore J. Adams, P.C., of Rosemont (Theodore J. Adams, of counsel), for appellants.

Lisa Madigan, Attorney General, of Chicago (Michael A. Scodro, Solicitor General, and Laura Wunder, Assistant Attorney General, of counsel), for appellees.

Panel

PRESIDING JUSTICE PALMER delivered the judgment of the court, with opinion.
Justices McBride and Gordon concurred in the judgment and opinion.

**OPINION**

¶ 1    Plaintiffs, Michael and Lynn Benz, served as foster parents for the minor, J.C., for approximately nine months. Following removal of the minor by the Department of Children and Family Services (DCFS), plaintiffs unsuccessfully pursued an administrative appeal, and then sought administrative review in the circuit court. Plaintiffs appeal from the circuit court's decision affirming DCFS's final administrative determination that J.C. should remain with a relative in Tennessee, Angela B. Plaintiffs concede that during the pendency of this case, Angela B.'s adoption of J.C. became finalized. As in the circuit court, the State maintains on appeal that plaintiffs' claims are moot.[1] Plaintiffs argue the public interest exception to the doctrine of mootness applies in this case and this court should therefore review their claims.

¶ 2                                    I. BACKGROUND

¶ 3    We recognize that this case involves an extensive record from the circuit court and administrative proceedings below. However, given our ultimate resolution of the case, we discuss the facts only to the extent necessary to resolve the dispositive issues on appeal.

¶ 4    J.C. was born on July 29, 2009, and taken into protective custody by DCFS on October 17, 2009, after his biological mother was arrested.[2] His father was incarcerated at the time. J.C. was placed in foster care with plaintiffs on October 28, 2009, with the initial goal being to return J.C. home to his biological mother. However, J.C.'s mother died on March 4, 2010, of a drug overdose. J.C.'s caseworker with Child Link, the welfare agency contracted with DCFS, asked plaintiffs whether they would be interested in adopting J.C., and they indicated that they were willing to do so. However, Angela B., a paternal relative of J.C. who lived in Tennessee, contacted Child Link regarding having J.C. placed with her, and Child Link began the process

[1]We note that the guardian ad litem for the minor was dismissed as a party to this appeal.

[2]J.C.'s half brother was also taken into protective custody and placed with the half brother's paternal grandmother.

of creating an interstate compact placement for J.C. In addition, J.C.'s biological father was released from prison and began to have supervised visits with J.C.

¶ 5    J.C. lived with plaintiffs for approximately nine months until he was removed on July 19, 2010, following an incident in plaintiffs' home on Saturday, July 17, 2010, when he was burned by a hot curling iron while being supervised by plaintiffs' 22-year-old daughter. Plaintiffs left a message on the office phone of J.C.'s Child Link caseworker, Melissa Rodriguez, regarding the incident, but did not contact Rodriguez on her cellular telephone or call Child Link's after-hours emergency number. In addition, plaintiffs took J.C. to a friend and neighbor who was a doctor for treatment, instead of taking him to an emergency room. Plaintiffs also canceled J.C.'s scheduled visit with his biological father the next day.

¶ 6    Upon learning of the injury, Rodriguez was instructed by her program director, Ayanna Sims, to call the state hotline and report the incident. Rodriguez went to plaintiffs' home to view the injury and then brought J.C. to the emergency room for evaluation on July 19, 2010.

¶ 7    Also on July 19, Sims decided that J.C. had to be removed from plaintiffs' home based on the recommendation of the supervisor of the Department of Child Protection (DCP), Marnita Martin-Harris. They believed J.C. was in imminent risk of harm and the circumstances necessitated further investigation.

¶ 8    While at the hospital, a worker from DCFS arrived and informed Lynn Benz that J.C. was being removed pending investigation because he had been injured in the home. J.C. was placed in an emergency respite foster home for a few days and later placed with his paternal grandfather and the grandfather's ex-wife. Rodriguez prepared an "unusual incident report" on July 23, 2010.

¶ 9    Plaintiffs received a "notice of change of placement" on July 24, 2010, which indicated that J.C. was removed because he suffered second-degree burns, prompting an investigation. The State concedes that, although the notice was dated July 19, 2010, the envelope was postmarked July 23, 2010, and Rodriguez and Sims had backdated the notice to July 19 even though they prepared it after that date.

¶ 10    DCFS initiated an investigation of plaintiffs.[3] In addition, Child Link conducted a licensing investigation of plaintiffs, but ultimately found no licensing violations.

¶ 11    Following J.C.'s removal, plaintiffs pursued an administrative appeal for his return. Plaintiffs requested a clinical placement review and an emergency review. See 89 Ill. Adm. Code 337.30, amended at 36 Ill. Reg. 4388 (eff. Mar. 7, 2012). Reviewer Belinda White refused plaintiffs' request for a separate emergency review.

¶ 12    The clinical placement review occurred on August 5, 2010. White issued her findings and recommendation on August 12, 2010. White held that although plaintiffs received written notice a few days after J.C. was removed, plaintiffs acknowledged that they were nevertheless orally informed at the time of removal that he was being removed due to the burns he received while in their care. White observed that plaintiffs had provided a caring home, but there were concerns regarding the burn incident: plaintiffs should have taken him to the hospital and not sought care from a neighbor, plaintiffs failed to timely inform Child Link of the injury, and they should not have canceled the visit with his biological father without authorization. White

---

[3]DCFS eventually sent a letter to plaintiffs on October 7, 2010, indicating that their investigation of the report of suspected child abuse or neglect was determined to be "unfounded."

concluded that J.C. was at imminent risk of harm prior to removal. She determined that, as J.C. had been moved on multiple occasions, he should remain with his paternal grandfather while his biological father worked toward reunification. She recommended that if J.C. were to be moved again, he should live with his relatives in Tennessee.

¶ 13 Following the clinical placement review, plaintiffs requested a service appeal on August 17, 2010. Plaintiffs also filed an emergency motion to remand to the clinical placement reviewer in order to receive an emergency review. Administrative law judge Lola Fahler denied the motion upon finding that when the change of placement of a child is challenged, the statutorily provided procedure consisted of a clinical placement review followed by a service appeal, and the child shall be placed in accordance with that decision while the appeal is pursued.

¶ 14 The administrative hearing regarding plaintiffs' service appeal before Judge Fahler occurred over several days spanning several months from December 2010 through July 2011. Plaintiffs presented the testimony of several witnesses and presented numerous exhibits. Judge Fahler issued her written recommendation on August 31, 2011. Judge Fahler found that plaintiffs were initially a short-term placement for the minor as there were no relatives who were willing or able to care for him, and when J.C.'s biological mother died, Rodriguez asked plaintiffs if they were interested in adopting J.C. However, relatives of J.C.'s biological father then contacted Rodriguez and expressed a desire to have J.C. placed with them, and J.C.'s father was released from jail and began supervised visits with the minor.

¶ 15 With respect to the incident in which J.C. was burned, Judge Fahler expressed concern that plaintiffs did not contact Rodriguez on her cellular telephone or call Child Link's emergency number to report the incident, they left a message about the incident on Saturday night on Rodriguez's office telephone, they did not take him to the emergency room, and they canceled the scheduled visit with his biological father the next morning. Judge Fahler found that after Rodriguez visited J.C. in plaintiffs' home, she consulted with Sims and Martin-Harris, and it was decided that J.C. would be removed pending investigation, and Lynn Benz was informed at the hospital on July 19 that J.C. was being removed. Judge Fahler found that Rodriguez and Sims falsely backdated the notice of change of placement to July 19, 2010.

¶ 16 In addition, Judge Fahler found that, in performing the clinical placement review, White was not aware that J.C.'s grandfather was disabled and that White was informed by Child Link's chief executive officer that there was possible collusion by Child Link staff, but White did not pursue these allegations before rendering her decision. Judge Fahler found White's testimony not credible at the administrative hearing. Judge Fahler explained that the evidence showed that Child Link sent an email to plaintiffs in August 2010 indicating that Sims had recommended that J.C. be returned. In August 2010, the case was transferred from Child Link to Volunteers of America, and the new caseworker was not aware of Child Link's plan to return J.C. to plaintiffs. Volunteers of America determined that it was not appropriate to move J.C. because he was living with relatives. J.C.'s biological father planned to move to Tennessee, and he expressed a desire for J.C. to be placed with relatives in Tennessee. J.C. began extended visits with Angela B., and J.C. was placed there on March 18, 2011. Judge Fahler found that there were concerns with J.C.'s placement with his grandfather and the grandfather's ex-wife because the sleeping arrangements for J.C. were not appropriate, the home was owned by the ex-wife, and the grandfather was disabled and unable to adopt J.C. on his own. Based on the foregoing, Judge Fahler held that White's decision was not consistent

with J.C.'s needs regarding safety, well-being, and permanency. Judge Fahler recommended that J.C. be returned to plaintiffs.

¶ 17    Meanwhile, as plaintiffs' administrative case was proceeding, there was also an ongoing juvenile court case involving the minor.[4] As stated, J.C. began visits with Angela B. in November 2010, and on March 18, 2011, the juvenile court entered an order placing J.C. in Angela B.'s home. J.C.'s biological father died from a drug overdose in July 2011. Thereafter, Angela B. sought to adopt J.C. On September 30, 2011, the juvenile court entered orders terminating the parental rights of J.C.'s biological parents and setting adoption as the permanency goal.

¶ 18    With respect to plaintiffs' administrative proceedings, having received Judge Fahler's recommendation, the Acting Director of DCFS, Jean Ortega-Piron, decided on October 14, 2011, to remand the case in order to conduct an independent assessment of J.C.'s then-current best interests as he had been living with Angela B. since March 2011. Thereafter, an independent review was performed by the Juvenile Protective Association (JPA). The JPA reviewed the case documentation and interviewed plaintiffs, Angela B., and others and issued a detailed report on November 14, 2011. The report concluded that J.C. had formed a strong bond with Angela B. and should remain with her.[5]

¶ 19    In light of the JPA's assessment, Ortega-Piron issued a written final administrative decision on November 21, 2011, finding that it was in J.C.'s current best interests to remain with Angela B. in Tennessee, given that J.C. had been placed with Angela B. since March 18, 2011, he had formed a strong attachment to her, Angela B. was committed to keeping him, and considering his age and prior upheavals, it was critical that he be able to preserve and build on his bond with Angela B.

¶ 20    Following Ortega-Piron's final determination, plaintiffs filed a complaint for administrative review in the circuit court in December 2011. In their subsequently amended complaint, plaintiffs asserted that the administrative proceedings violated their procedural due process rights based on (1) removal of J.C. from his "pre-adoptive" foster parents without advance notice when he was not in imminent risk of harm; (2) failure of DCFS to conduct an emergency review of its decision to remove J.C.; (3) delays in the administrative proceedings in the service appeal which failed to adhere to the timelines set forth in DCFS regulations; and (4) failure of the clinical placement review, service appeal, and final DCFS decision to comply with Illinois law. Plaintiffs also claimed that Ortega-Piron's decision should be reversed as it was against the manifest weight of the evidence and contained errors of law, and that DCFS should be sanctioned for arguments it advanced in the service appeal that were legally erroneous.

¶ 21    On January 17, 2013, the circuit court entered an order affirming the DCFS Director's decision. The circuit court set forth a detailed statement of the facts and ultimately held that plaintiffs' due process claims were moot. Further, plaintiffs had not established that they should be reviewed pursuant to the public interest exception to the mootness doctrine because

---

[4]Angela B. filed a motion to obtain guardianship of J.C. in the juvenile proceedings and plaintiffs moved to intervene in the proceedings, but the juvenile court denied both motions.

[5]The report noted, however, that the circumstances of J.C.'s removal from plaintiffs had posed an unjustified risk to his psychological well-being and could have been implemented in a different way to allow for a transition period.

- 5 -

plaintiffs had not made a clear showing that their case met the criteria for the exception. The court indicated that J.C. had bonded with and was thriving with Angela B., with whom he had been residing for two years, the court lacked the equitable power to make a placement decision, and moving the minor at this point risked harming him.

¶ 22 Notwithstanding its mootness determination, the circuit court also held that plaintiffs failed to establish that they had a protected liberty interest at stake, which was a necessary component of their claimed due process violation. Even so, the court found that it was clear from the record and transcripts that plaintiffs "had many opportunities to present evidence, cross-examine witnesses, and inspect documents." The court noted that plaintiffs were "intensely thorough" in presenting their case and no evidence supported that they were denied due process. The court held that Ortega-Piron's decision was not clearly erroneous and that, regardless of any procedural errors, the record "overwhelmingly demonstrates that it is in the best interests of J.C. to remain in his current stable and loving environment." Regarding plaintiffs' request for sanctions, the circuit court concluded that Illinois Supreme Court Rule 137 (eff. Feb. 1, 1994) was inapplicable because the rule only applied to certification of pleadings by an attorney and did not apply to administrative proceedings.

¶ 23 Plaintiffs appeal from the circuit court's order. The parties did not dispute that in May 2013, the court entered a final adoption judgment in which Angela B. became J.C.'s adoptive parent, and J.C.'s guardianship and wardship were terminated and the juvenile case was closed.

¶ 24 II. ARGUMENT
¶ 25 A. ILLINOIS SUPREME COURT RULE 341
¶ 26 As an initial matter, the State asserts that plaintiffs' opening brief fails to comply with Illinois Supreme Court Rule 341 (eff. Feb. 6, 2013) in several respects and this court should therefore deny or limit its consideration of their appeal. The State contends that plaintiffs' brief is not double-spaced, is in less than 12-point font, uses excessive footnotes, contains a selective and argumentative statement of facts, and fails to properly cite the record in the argument section. See Ill. S. Ct. R. 341(a), (b)(1), (h)(6)-(7) (eff. Feb. 6, 2013).

¶ 27 We note that plaintiffs' opening brief is 49 pages and it contains almost as many single-spaced footnotes–48–in many of which plaintiffs make substantive arguments. The supreme court rules provide that "[f]ootnotes are discouraged." Ill. S. Ct. R. 341(a) (eff. Feb. 6, 2013). Further, "[s]ubstantive arguments may not be made in footnotes" and the court may strike them from consideration. *Technology Solutions Co. v. Northrop Grumman Corp.*, 356 Ill. App. 3d 380, 382 (2005). Plaintiffs' brief also appears to be less than double-spaced. We note that we previously denied plaintiffs' motion to file a brief in excess of 75 pages with a separate statement of facts that would not count toward the 50-page limit under Rule 341(b)(1). Clearly, had plaintiffs incorporated these 48 single-spaced footnotes into the body of their 49-page brief, they would have exceeded the 50-page limit. This leads us to conclude that plaintiffs were attempting to avoid this court's ruling and the page limitation in Rule 341(b)(1) through the use of footnotes and by failing to adhere to the double-spacing requirement. *Technology Solutions*, 356 Ill. App. 3d at 383. Additionally, plaintiffs' statement of facts occasionally contains improper argument. Notwithstanding these deficiencies, we will address the issues presented on appeal as they warrant further discussion and resolution. "If an appellant's brief violates the supreme court rules, this court has the authority to dismiss the

appeal. [Citation.] However, Supreme Court Rule 341 is an admonishment to the parties, not a limitation on the jurisdiction of the reviewing court, and the reviewing court has discretion in order to reach a just result." *In re Jacorey S.*, 2012 IL App (1st) 113427, ¶ 17. However, we "will disregard any inappropriate or unsupported material, and any substantive arguments contained only in the footnotes." *John Crane, Inc. v. Admiral Insurance Co.*, 2013 IL App (1st) 093240-B, ¶ 29.

¶ 28                                     B. MOOTNESS

¶ 29    On appeal, plaintiffs contend that their procedural due process rights were violated because (1) in contravention of the applicable administrative rules, J.C. was removed from their home without prior written notice or a determination that he was at imminent risk of harm, and the evidence did not show that he was in imminent risk of harm, (2) plaintiffs were entitled to, but were denied, an emergency review of the decision to remove him, (3) the discretion of the clinical placement reviewer was so limited as to render the review a sham proceeding, and (4) DCFS failed to adhere to the statutory time limits for service appeals, which extended the appeal process for approximately three years. Plaintiffs assert that they had a constitutionally protected liberty interest at stake in proceedings related to removal of a foster child and this liberty interest arose under state statutes and Administrative Code provisions. Further, plaintiffs argue that the DCFS Director's decision should be reversed as it was not based on the record.

¶ 30    Similar to its arguments below, the State contends that, with the exception of the sanctions issue, plaintiffs' claims are moot because the minor's adoption has since been finalized during the pendency of this appeal. Plaintiffs concede that the minor has been adopted and cannot be returned to them. However, they assert that this court should review the merits of their appeal under the public interest exception to the doctrine of mootness. The State counters that the public interest exception does not apply here to allow for this court's review.

¶ 31    "As a general rule, courts in Illinois do not decide moot questions, render advisory opinions, or consider issues where the result will not be affected regardless of how those issues are decided." *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009). Our supreme court has "consistently held that '[a]n appeal is moot when it involves no actual controversy or the reviewing court cannot grant the complaining party effectual relief.' " *In re Marriage of Donald B.*, 2014 IL 115463, ¶ 23 (quoting *Steinbrecher v. Steinbrecher*, 197 Ill. 2d 514, 522-23 (2001)). When such is the case, the court "will not review cases 'merely to establish a precedent or guide future litigation.' " *Id.* (quoting *Madison Park Bank v. Zagel*, 91 Ill. 2d 231, 235 (1982)). The court also generally avoids issuing an advisory opinion when "a case is pending on appeal when the events that render an issue moot occur." *Id.* Whether a claim is moot is an issue we review *de novo* on appeal. *Preferred Personnel Services, Inc. v. Meltzer, Purtill & Stelle, LLC*, 387 Ill. App. 3d 933, 938 (2009).

¶ 32    We agree with the circuit court and the State that, except for plaintiffs' claim for sanctions, the issues presented in plaintiffs' appeal have been rendered moot by the finalization of J.C.'s adoption. In the administrative appeal proceedings and in the circuit court, plaintiffs sought to challenge the removal of J.C. and sought reversal of the various administrative decisions against them in that regard. The parties agree that while this appeal was pending, J.C.'s adoption by Angela B. was finalized. Given these circumstances, it would be impossible for this court to grant plaintiffs effectual relief. *In re Alfred H.H.*, 233 Ill. 2d at 352. We find that

the issue has been rendered moot, and we decline to render an advisory opinion or render an opinion merely to guide future litigation. *In re Marriage of Donald B.*, 2014 IL 115463, ¶ 23.

¶ 33　　Having concluded that the appeal before us is moot, we must now consider whether the public interest exception to the mootness doctrine applies here. "The public interest exception to the mootness doctrine allows a court to consider an otherwise moot issue when (1) the question presented is of a substantial public nature; (2) there is a need for an authoritative determination for the future guidance of public officers; and (3) there is a likelihood of future recurrence of the question." *In re Marriage of Donald B.*, 2014 IL 115463, ¶ 33. As the public interest exception "is construed narrowly, *** a clear showing of each criterion is required to bring a case within its terms." *In re Adoption of Walgreen*, 186 Ill. 2d 362, 365 (1999).

¶ 34　　Although plaintiffs strenuously argue that this case involves legal questions which impact numerous other "pre-adoptive" foster parents, considering the lengthy and unique procedural circumstances of this case, we disagree with this assertion. The crux of plaintiffs' argument is not so much that the applicable administrative provisions and statutes themselves violate due process, but that DCFS failed to comply with these provisions and thereby deprived plaintiffs, specifically, of the proper notice and procedure to which they were entitled.

¶ 35　　Our supreme court has directed that "when an opinion on a question of law cannot affect the result as to the parties or controversy in the case before it, a court should not resolve the question merely for the sake of setting a precedent to govern potential future cases." *In re Adoption of Walgreen*, 186 Ill. 2d at 365. Indeed, "[t]his limitation is no mere technicality. The existence of a real controversy is a prerequisite to the exercise of our jurisdiction." *Id.* "If all that was required under this factor was that the opinion could be of value to future litigants, the factor would be so broad as to virtually eliminate the notion of mootness." *In re Alfred H.H.*, 233 Ill. 2d at 357.

¶ 36　　For example, in *In re Adoption of Walgreen*, 186 Ill. 2d at 364, the Illinois Supreme Court held that the issue of whether various provisions of the Adoption Act (750 ILCS 50/1 *et seq.* (West 1992)) were unconstitutional was moot because the grandparents' adoption of their grandchildren became finalized during the pendency of the appeal. Even though the issue (the constitutionality of the standards measuring the biological mother's fitness) presented "a question of substantial public interest," the court declined to review the constitutional issue under the public interest exception because there was no need for an authoritative determination given that the law was not in disarray and there was no conflicting precedent. *In re Adoption of Walgreen*, 186 Ill. 2d at 365-66. Because the adoption was finalized, the constitutionality of the standards would "not be at issue again." *Id.* at 366. Similar to the circumstances here, the *Walgreen* court observed that "[t]he constitutionality of the fitness provisions may still arise in other adoption cases. There is no reason to believe, however, that the question cannot be fully litigated by the affected parties there. The long and complex history of this case demonstrates that this is not the sort of dispute which is, by its nature, too short in duration to be fully litigated prior to its cessation." *Id*. See also *In re Alfred H.H.*, 233 Ill. 2d at 358 (holding that the public interest exception to mootness did not apply because the case did not involve a situation where the law was in disarray or there was conflicting precedent).

¶ 37　　Accordingly, we do not believe that this case falls within the narrow confines of the public interest exception to mootness. Plaintiffs have failed to show "that there is a 'need to make an authoritative determination for future guidance of public officers.' " *In re Alfred H.H.*, 233 Ill.

2d at 357-58 (quoting *In re Adoption of Walgreen*, 186 Ill. 2d at 365). Additionally, with respect to plaintiffs' challenge that the Director's final decision was clearly erroneous, our supreme court has directed that "case-specific inquiries, such as sufficiency of the evidence, do not present the kinds of broad public issues required for review under the public interest exception." *In re Rita P.*, 2014 IL 115798, ¶ 36.

¶ 38    Moreover, even if we were to hold that the appeal was not moot or that the strict criteria for the public interest exception were met, we would nevertheless conclude that plaintiffs have failed to establish that they have a constitutionally protected liberty interest at stake. Plaintiffs cite to Illinois statutes and the Administrative Code in support of their argument that they had a constitutionally protected liberty interest. "However, for a statute to grant a person a protected liberty interest, the person must have a legitimate claim of entitlement to the liberty interest." *In re Adoption of C.D.*, 313 Ill. App. 3d 301, 313 (2000). In fact, Illinois case law makes clear that such a liberty interest does not exist in the present circumstances. "[S]ince Illinois law does not create an expectation of a continued relationship, foster parents have no constitutionally protected liberty interest in the continued custody of their charges." *Johnson v. Burnett*, 182 Ill. App. 3d 574, 583 (1989). "The role of the foster parent, as envisioned by Illinois law, is that of a temporary way station on the road of a child's life until the difficulties at home can be straightened out." *Id.* at 582. Although parents have a fundamental liberty interest in the "care, custody, and management" of their child, "[f]oster parents do not share this liberty interest in the children for whom they care." *In re A.H.*, 195 Ill. 2d 408, 423 (2001). Notwithstanding plaintiffs' citation to cases from foreign jurisdictions, which are not controlling here, plaintiffs have failed to demonstrate that Illinois law grants foster parents a liberty interest in a continued relationship with a foster child under the present circumstances.

¶ 39    In ruling, we observe that a failure to provide timely notice to foster parents when statutorily required may be deemed harmless, such as where the foster parent waives the issue or otherwise appears and participates in the proceedings. *In re A.H.*, 195 Ill. 2d at 424. In *A.H.*, the guardian *ad litem* made an oral motion for removal of the foster child from the foster parents, but our supreme court held that there was no due process violation because the foster parents were not "necessary parties" entitled to notice of juvenile court proceedings under the Juvenile Court Act of 1987 (705 ILCS 405/1-1 *et seq.* (West 1998)). *In re A.H.*, 195 Ill. 2d at 423-24. Further, although the foster parent was statutorily entitled to proper notice, the failure to provide it was harmless because the foster parent waived the issue when she failed to object and then appeared the next day at the hearing regarding removal of the child. *Id.* at 424.

¶ 40    Having reviewed the voluminous record in this case, we agree with the circuit court that plaintiffs were afforded sufficient procedural safeguards throughout the administrative and circuit court proceedings. Although plaintiffs did not receive written notice until a few days after J.C. was removed from their home, plaintiffs nevertheless were given oral notice that J.C. was being removed when the DCFS worker informed Lynn Benz of this at the hospital on the day of removal. Further, although plaintiffs' requests for an emergency review were denied, plaintiffs had the opportunity to challenge the decision to remove J.C. soon after it was made during the clinical placement review, again during the administrative service appeal hearing, and in the circuit court proceedings. Plaintiffs had the opportunity to present a plethora of testimonial and documentary evidence, cross-examine witnesses, and present argument in support of their claims.

¶ 41    Based on this record, plaintiffs have not demonstrated that they had a protected liberty interest or that their procedural due process rights were violated.

¶ 42                                    C. RULE 137 SANCTIONS

¶ 43    Plaintiffs also assert that they were entitled to sanctions against DCFS pursuant to Illinois Supreme Court Rule 137. Plaintiffs assert that during the service appeal, DCFS advanced in writing an argument that was legally erroneous and lacked a reasonable basis, *i.e.*, that plaintiffs were not entitled to an emergency review. The State argues that Rule 137 sanctions do not apply to an improper filing in administrative review proceedings and sanctions were not warranted as DCFS's argument was not unreasonable.

¶ 44    Rule 137 provides that "every pleading submitted by a party represented by an attorney [must] be signed by that attorney, the signature constituting a certification that the attorney has read the pleading and that to his knowledge, the pleading is well grounded in fact and is warranted by law." *Kensington's Wine Auctioneers & Brokers, Inc. v. John Hart Fine Wine, Ltd.*, 392 Ill. App. 3d 1, 15 (2009) (citing Ill. S. Ct. R. 137 (eff. Feb. 1, 1994)). The rule aims to prevent parties from abusing the judicial process by filing vexatious or harassing actions lacking legal or factual support. *Reyes v. Compass Health Care Plans*, 252 Ill. App. 3d 1072, 1078-79 (1993). "[T]he trial court must employ an objective standard and determine what was reasonable at the time the party filed its pleading." *Kensington's Wine Auctioneers*, 392 Ill. App. 3d at 18. The rule applies only to pleadings, motions, and other papers filed by a litigant. *Id.* at 15. As such, "it does not authorize sanctions for all violations of court rules and acts of misconduct." *Id.* The party requesting sanctions bears the burden of showing that sanctions are warranted. *Reyes*, 252 Ill. App. 3d at 1079. A circuit court's decision whether to impose sanctions pursuant to Rule 137 is reviewed for an abuse of discretion. *Spiegel v. Hollywood Towers Condominium Ass'n*, 283 Ill. App. 3d 992, 1001 (1996). An abuse of discretion occurs where the trial court "acted arbitrarily, without employing conscientious judgment, or whether, in view of all the circumstances, the court exceeded the bounds of reason and ignored recognized principles of law so that substantial prejudice resulted." *State Farm Fire & Casualty Co. v. Leverton*, 314 Ill. App. 3d 1080, 1083 (2000). Where the decision requires interpretation of a supreme court rule, it involves a question of law subject to *de novo* review. *People v. Stefanski*, 377 Ill. App. 3d 548, 550-51 (2007).

¶ 45    We conclude that the circuit court did not abuse its discretion in rejecting plaintiffs' request for sanctions. Supreme Court Rule 1 limits the applicability of the supreme court rules "to both civil and criminal proceedings. The rules on proceedings in the trial court, together with the Civil Practice Law ***, shall govern all proceedings in the trial court ***." Ill. S. Ct. R. 1 (eff. July 1, 1982). See *Rodriguez v. Sheriff's Merit Comm'n*, 218 Ill. 2d 342, 354 (2006) ("supreme court rules, together with article II of the Code of Civil Procedure, *i.e.*, the Civil Practice Law (735 ILCS 5/1-101(b) (West 2002)), apply to all proceedings in the trial court"). With respect to circuit court review of administrative proceedings, the supreme court dictates that litigation commences and parties become "litigants" within the meaning of the rules when a plaintiff files a complaint for administrative review in the circuit court. *Rodriguez*, 218 Ill. 2d at 354. "Prior to plaintiff filing her complaint, no litigation existed, hence no litigants existed and, hence, supreme court rules did not yet apply." *Id.*

¶ 46    In their petition for rehearing, the appellants reassert their position that the third paragraph of Illinois Supreme Court Rule 137 provides a vehicle to claim sanctions for a "false

argument" at the administrative level. Appellants cite no authority for this position and we do not find it persuasive.[6] Rule 137(c) provides:

> "(c) Applicability to State Entities and Review of Administrative Determinations. This rule shall apply to the State of Illinois or any agency of the State in the same manner as any other party. Furthermore, where the litigation involves review of a determination of an administrative agency, the court may include in its award for expenses an amount to compensate a party for costs actually incurred by that party in contesting on the administrative level an allegation or denial made by the State without reasonable cause and found to be untrue." Ill. S. Ct. R. 137(c) (eff. July 1, 2013).

¶ 47    Here, the trial court found, and we agree, that this provision does not provide a vehicle for a sanction order that is independent of the proceedings in the trial court. Rather, this provision allows that a sanction order for an improper *court* filing may also include expenses incurred at the administrative level.

¶ 48    However, it must also be noted that while this paragraph does extend the reach of Rule 137 sanctions to the administrative level, that reach is much more limited. As noted, Rule 137(a) requires an attorney's signature certifying that a pleading is well grounded in fact and warranted by law. *Kensington's Wine Auctioneers & Brokers*, 392 Ill. App. 3d at 15. The provision relied upon by appellants here, now Rule 137(c), contains markedly different language. Costs may be recovered thereunder for "contesting on the administrative level an *allegation* or *denial* made by the State without reasonable cause and found to be untrue." (Emphasis added.) Ill. S. Ct. R. 137(c) (eff. July 1, 2013). This relates to a factual allegation or the denial of a factual allegation. An allegation is defined as a formal statement of a factual matter. See Black's Law Dictionary 74 (7th ed. 1999) (defining "allegation" as "[s]omething *** asserted as a matter of fact, esp. in a legal pleading; a party's formal statement of a factual matter as being true or provable, without its having yet been proved").

¶ 49    In contrast, the appellant's request for sanctions relates to an allegedly legally erroneous argument, that they were not entitled under the law to an emergency review, as opposed to a false statement of fact. They are claiming that the argument was not warranted at law, and as such, the claim does not fall within the ambit of Rule 137(c).

¶ 50    To the extent that plaintiffs argue that DCFS should be sanctioned for positions taken during the proceedings in the circuit court, we similarly find that sanctions are not warranted. DCFS's arguments were not contrary to law and were reasonable under the circumstances.

¶ 51    Section 337.30 of Title 89 of the Illinois Administrative Code provides that, "[w]hen the issue is the removal of a child from the home of a foster family or relative caregiver, the service appeal process for the Department of Children and Family Services consists of a fair hearing after a clinical placement review of the decision to remove the child pursuant to subsection (c)." 89 Ill. Adm. Code 337.30, amended at 36 Ill. Reg. 4388, 4400-01 (eff. Mar. 7, 2012). Further, this section specifies that an emergency review "*is not available to any party when the issue is removal or change of placement of a child.*" (Emphasis added.) 89 Ill. Adm. Code 337.30, amended at 36 Ill. Reg. 4388, 4399 (eff. Mar. 7, 2012). Section 337.30(c) provides that DCFS "or provider agency may immediately remove a child from a foster family *** without timely notice to the family, when the child is determined to be at imminent risk of harm in the

---

[6]We note that Rule 137 was amended on June 14, 2013, effective July 1, 2013, to provide paragraph headings, but is otherwise substantively the same for our purposes concerning paragraph (c).

current placement." 89 Ill. Adm. Code 337.30(c)(5), amended at 36 Ill. Reg. 4388, 4402 (eff. Mar. 7, 2012). Further, this section also directs that when a party appeals from the final decision of a clinical placement review, "the child shall be placed in accordance with that decision during the pendency of the appeal." 89 Ill. Adm. Code 337.30(c)(8), amended at 36 Ill. Reg. 4388, 4402 (eff. Mar. 7, 2012). Thus, in plaintiffs' case, DCFS was permitted to immediately remove J.C. without timely notice based on its determination that he was at imminent risk of harm, and the proper procedure to challenge the removal was a clinical placement review followed by an appeal from that decision if necessary, while J.C. remained in the new placement. As discussed, this is what occurred here.[7]

¶ 52   Additionally, section 337.30(b) specifies that only two issues can be reviewed in an emergency review, only one of which is relevant here: where action was taken by DCFS or a provider agency without timely notice because the child was determined to be at imminent risk of harm. 89 Ill. Adm. Code 337.30(b)(1), (2), amended at 36 Ill. Reg. 4388, 4900 (eff. Mar. 7, 2012). However, the language of section 337.30(b) further provides that, in such a situation, the availability of an emergency review is limited to "any issue, *except placement*." (Emphasis added.) *Id.* As "[a] party may request an emergency review within 10 calendar days after the date of appeal on any issue, except placement" (89 Ill. Adm. Code 337.30(b)(1), amended at 36 Ill. Reg. 4388, 4400 (eff. Mar. 7, 2012)), plaintiffs' request for an emergency review was properly denied in this case because their challenge was based on the removal and change in placement of J.C. Thus, pursuant to section 337.30(b)(1), an emergency review was not available to plaintiffs. The fact that no emergency review was available to them is buttressed by language set forth earlier in section 337.30, *i.e.*, "emergency review is not available to any party when the issue is removal or change of placement of a child." 89 Ill. Adm. Code 337.30, amended at 36 Ill. Reg. 4388, 4399 (eff. Mar. 7, 2012).

¶ 53   Based on the foregoing, Rule 137 sanctions were not applicable in this case. Further, DCFS had a proper legal basis for opposing plaintiffs' requests for an emergency review and for its assertions that plaintiffs' due process rights were not violated in failing to be granted one. The trial court did not abuse its discretion in refusing to sanction DCFS.

¶ 54                                 III. CONCLUSION
¶ 55   For the reasons stated, we affirm the judgment of the circuit court of Cook County.

¶ 56   Affirmed.

---

[7]We refer to the most recent and current version of section 337.30, which became effective on March 7, 2012. However, we note that the prior version also provided for a service appeal process when the issue was removal or placement of a child, and further provided that an emergency review was not available when the issue was removal or change of placement of a child. See 89 Ill. Adm. Code 337.30, amended at 26 Ill. Reg. 6246, 6254 (eff. June 1, 2002). The prior version did not contain the language set forth in the current sections 337.30(c)(5) or (8).