2025 IL App (1st) 241779

THIRD DIVISION
July 16, 2025

No. 1-24-1779

**IN THE
APPELLATE COURT OF ILLINOIS
FIRST JUDICIAL DISTRICT**

| | |
|---|---|
| IN THE INTEREST OF:<br>J.B. and A.A., minors,<br><br>      Respondents-Appellees, | ) Appeal from the<br>) Circuit Court of<br>) Cook County<br>)<br>) Nos. 2010 JA 00562;<br>)      2010 JA 00563<br>) |
| THE PEOPLE OF THE STATE OF ILLINOIS,<br><br>      Petitioner-Appellee,<br><br> v.<br><br>FANTASIA D.,<br><br>      Respondent-Appellant,<br><br>(Anthony R.<br><br>      Private Guardian-Appellee). | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) Honorable<br>) Patrick T. Murphy,<br>) Judge, Presiding. |

   JUSTICE D.B. WALKER delivered the judgment of the court, with opinion.
   Presiding Justice Lampkin and Justice Reyes concurred in the judgment and opinion.

**OPINION**

¶ 1        Fantasia D. (Ms. D.) appeals the trial court's order denying her petition to discharge Anthony R. (Mr. R.) as the private guardian of her children J.B. and A.A. On appeal, Ms. D. contends that the trial court erred when it considered the petition pursuant to the Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/2 *et seq.* (West 2024)), instead of the Probate Act of 1975 (Probate Act) (755 ILCS 5/11 *et seq.* (West 2024)). She also contends that the trial court's finding that it was in the children's best interest to maintain the private guardianship was against the manifest weight of the evidence. For the following reasons, we affirm.

¶ 2                                    I. BACKGROUND

¶ 3        Ms. D. is the biological mother of J.B., born in November 2006, and A.A., born in January 2010. On June 20, 2010, the State filed petitions for adjudication of wardship of J.B. and A.A. and temporary custody, alleging neglect of the minors under sections 2-3(1)(a) and 2-3(1)(b) of the Juvenile Court Act (705 ILCS 405/2-3(1)(a), (b) (West 2024)). The petition alleged that A.A. was hospitalized with Hyponatremic seizures and failure to thrive, and Ms. D. failed to attend follow-up appointments. Both children did not receive their recommended immunizations and missed their annual checkups. On March 22, 2011, the court found that A.A. and J.B. were neglected due to lack of care and an injurious environment. On June 11, 2011, the court found that Ms. D. was unable, unwilling, and unfit to care for A.A. and J.B., and they were adjudicated wards of the court. The Department of Children and Family Services (DCFS) guardianship administrator was appointed as their guardian. The children were then placed with Ms. D.'s aunt, Mrs. R., and her husband, Mr. R.

¶ 4        In 2013, the trial court entered an order stating that the permanency goal for A.A. and J.B. was private guardianship. The court found that Ms. D. was not making substantial progress towards

- 2 -

the return of her children, and the children have bonded with their foster parents. The order stated that Mr. and Mrs. R. "wish[ed] to provide permanency." Also in 2013, Ms. D. gave birth to her third son, E.L. Ms. D. was referred to Ellen Tannenbaum, a therapist with Catholic Charities, to support her parenting of E.L. She worked with Tannenbaum weekly for approximately one year. E.L. is not a party to these proceedings.

¶ 5 In October of 2013, DCFS filed motions to vacate its guardianship of A.A. and J.B., terminate their wardship, and close their cases. In the motion, DCFS stated that A.A. and J.B. had been adjudicated wards of the court, and that Ms. D. was found unable, unwilling and unfit to care for them. A petition had been filed to appoint Mr. and Mrs. R. as guardians of the person of the minors "pursuant to the Probate Act of 1975." The motion also stated that Mr. and Mrs. R. "are fully qualified to serve as guardians of the person of the minors pursuant to Section 11-3 of the Probate Act of 1975, and it is in the best interest of the minors to remain with Mr. and Mrs. [R.]"

¶ 6 On October 11, 2013, the trial court entered orders appointing Mr. and Mrs. R. as private guardians of A.A. and J.B. pursuant to the Probate Act. The court found that A.A. and J.B. were "living in a stable home," and that it was in their best interests "to have no further monitoring by the court." The guardianship would continue for each child until they reach 18 years of age. The order further provided that wardship of A.A. and J.B. "pursuant to the Juvenile Court Act of 1987 is vacated." Although the case was closed, the court retained jurisdiction "for purposes of modification and enforcement of this order."

¶ 7 On June 1, 2022, Ms. D. filed a petition to discharge the court-appointed legal guardian "pursuant to [the] Illinois Probate Act 755 ILCS 5/11-14.1(b)." Her petition was filed under the same child protection docket numbers used in the adjudication and disposition proceedings. When entering orders regarding Ms. D.'s petition, the trial court referred to the petition as a "2-33

motion," or a motion "to Reinstate Wardship[,] discharge guardianship and other relief" under the Juvenile Court Act.

¶ 8    In the petition, Ms. D. stated that Mr. and Mrs. R. were appointed as co-legal guardians of A.A. and J.B., and that Mrs. R. had passed away in 2016.[1] After guardianship was established, Ms. D. obtained an apartment near Mr. and Mrs. R. so she could maintain contact with her children. She received therapy and services from Catholic Charities, and she began to address the issues that led to the placement of her children with Mr. and Mrs. R. After Mrs. R. passed away, Ms. D. "[took] over much of the caretaking responsibilities of the minor children." During the COVID-19 pandemic, A.A. and J.B. spent the school day at her home. After the children returned to in-person learning, Ms. D. continued to have an active role in their education. A.A. and J.B. also spent "a significant amount of time" at her residence. Ms. D. stated that she and Mr. R. "enjoy a functional family relationship," which she wished to continue. She argued that it was "in the best interests of the minor children to terminate the guardianship and return them to [her] care."

¶ 9    In his response, Mr. R. argued that Ms. D. did not meet her burden under the Probate Act to show that there has been a material change in circumstances. Alternatively, Mr. R. argued that it was not in the minors' best interests to terminate the guardianship where they have lived with him for 12 years, and he has provided them safety to "explore the world" while also providing "steadiness and clear boundaries." Mr. R. asserted that he has been a responsible role model for A.A. and J.B., and termination of the guardianship "will mean instability for the minors."

¶ 10   On November 10, 2022, the trial court interviewed A.A., who was 12 years old, and J.B., who was 16 years old. Both expressed a desire to live with their mother. J.B. stated that he "just

---

[1]  Other testimony in the record indicated that Mrs. R. passed away in 2017.

like[d] it over here." A.A. stated that he was comfortable with his mother and he wanted to live with her because his little brother also lived with her. When asked how things were going with Mr. R., A.A. responded, "Cool."

¶ 11    J.B. told the court that his mother lives about five minutes from Mr. R., and he visits her often. He goes to her home every weekend and sometimes on weekdays if he does not have school. He feels safe with Ms. D. and her boyfriend. A.A. and J.B. stated that they loved both their uncle and their mother.

¶ 12    In February 2023, the parties attended a mediation and agreed that A.A. and J.B. would stay with Mr. R. from Sunday through Thursday morning, and with Ms. D. from Thursday after school through Sunday afternoon.

¶ 13    Mr. R. filed a response asking the court to deny the petition.

¶ 14               A. *Hearing on Petition to Discharge Private Guardian*

¶ 15    The hearing on Ms. D.'s petition began on August 1, 2023, and ended on August 7, 2024. The trial court interviewed A.A. and J.B. and then heard testimony from caseworkers Eric Gonzalez and Tanya Knight, therapist Tannenbaum, Ms. D., Ms. D.'s boyfriend Edward P., and Mr. R.

¶ 16    Prior to the hearing, Mr. Gonzalez suggested that A.A. and J.B. write letters stating their wishes on the issue. In the letters, the boys stated their desire to live with their mother and younger brother, and to maintain a relationship with their uncle. Mr. R.'s counsel expressed concern that the letters would be used to "manipulate the outcome of this case." The trial court held a discussion of the matter off the record.

¶ 17    The trial court also heard arguments from the parties on the applicable legal standard for discharging a private guardianship entered through a juvenile court case. Ms. D. argued that,

pursuant to the Probate Act, upon her showing that there has been a material change in circumstances, the guardian must establish by clear and convincing evidence that discharge would be against the minor's best interests. Mr. R., the State, and the Public Guardian argued that the best interest standard pursuant to the Juvenile Court Act should apply. The State and the Public Guardian argued that best interest must be shown by a preponderance of the evidence. The trial court determined that, once a change in circumstances has been shown, it would assess the minors' best interests as established by a preponderance of the evidence.

¶ 18                    1. *Interview with J.B. and A.A.*

¶ 19    J.B., who was 16 years old and a junior in high school, stated that he had lived with Mr. R. since he was three years old and now wanted to live with Ms. D. and his little brother E.L. He liked being with Ms. D. He thought Mr. R. had raised him well and did not believe Mr. R. would be upset if he lived with his mother. If he moved, J.B. would not have to change schools, and he would continue to visit Mr. R.

¶ 20    A.A. stated that he was 13 years old and in the eighth grade at school. He wanted to continue his relationship with Mr. R. but wanted to live with his mother. A.A. explained that he wanted to live with her because "my little brother is over there and stuff." A.A. "just like[d] it over there," and he also liked being at Mr. R.'s house.

¶ 21                    2. *Eric Gonzalez*

¶ 22    Mr. Gonzalez testified that he worked as a DCFS child welfare specialist and was assigned to the case of A.A. and J.B. for almost a year. He testified that Ms. D. has maintained stable housing for six to seven years, and she completed a drug and alcohol evaluation in October 2022. At this time, no services were recommended. Ms. D. uses marijuana and has a medical marijuana card. An August 1, 2023 court report showed that Ms. D. was diagnosed with "mild cannabis disorder."

¶ 23   Mr. Gonzalez considered the boys' wishes to live with Ms. D., and he considered Mr. R.'s capacity to care for them. He also considered the length of time Mr. R. has been caring for A.A. and J.B. Mr. Gonzalez acknowledged receiving reports of A.A.'s disciplinary issues at school. He also acknowledged a court report noting two hotline calls regarding A.A. and J.B. A call in December 2022 indicated that Mr. R.'s adult son permitted the boys to access firearms while at home. Mr. R. agreed to prohibit unsupervised contact between the boys and his adult son.

¶ 24   Responding to this testimony, the trial court observed that

> "[i]t seems we got a case where a guy and his wife take these kids on. He does a hell of a good job in raising them, now the mother comes along and she is better. She wants them back. The kids want to go live with their mother. Maybe they are right, maybe they are wrong. We have to give some difference [*sic*] to the kids. But I don't see any bad guys in this picture. So try to paint [Mr. R.] as a bad guy ain't going to go nowhere with me. That's all I can tell you. So let's move on."

¶ 25   Mr. Gonzalez testified that Ms. D. has involved herself in her children's lives. "[S]he is living well, doing well for herself, considering the best interest of the children." In making his recommendation to vacate the guardianship, Mr. Gonzalez considered the wishes of A.A. and J.B. to live with Ms. D., as well as the fact that they wished to continue a relationship with Mr. R. It was important that Ms. D. also wanted to maintain that relationship. However, based on the children's wishes, Mr. Gonzalez recommended that the guardianship be vacated.

¶ 26   Mr. Gonzalez had not yet made a recommendation regarding "what ongoing contact with [Mr. R.] should look like." He testified:

> "[E]verybody's desire is to continue as a family. However, that dynamics [*sic*] may change from what I understand and from what I could see. These boys have nothing else other than

their uncle. There is a wife that passed now, that is their family, that is what they know. However, they also wish to be with their mother. *** I do think the family will need some time to reestablish that dynamics [*sic*] in their house. And [whoever is] their central parent and disciplinarian[,] that will come with some testing because they are teenager [*sic*] boys."

¶ 27 On cross-examination, Mr. Gonzalez acknowledged that he never spoke with A.A. or J.B. He also acknowledged that he asked Ms. D. to have A.A. and J.B. write letters. He agreed that the boys' wishes, as expressed in the letters, may have been influenced by Ms. D. asking them to write the letters. When asked whether the issues that brought A.A. and J.B. into the system had been resolved, Mr. Gonzalez responded that he did not consider the issue. The trial court emphasized that the issue before it was the children's best interests.

"So whatever the reason was that brought it in is not the issue. The issue is we got a great guy [Mr. R.] who did a great job raising these kids. We have a mother who seems to have gotten her act together, doing a very good job and the kids love her. They love their uncle. It is a difficult case, but that is the issue."

¶ 28                                3. *Ellen Tannenbaum*

¶ 29 Ms. Tannenbaum testified that she is a clinically licensed therapist who worked with Ms. D. in 2013 and 2021. At the time of the hearing, she was the Director of Behavioral Health at Catholic Charities. She provided services to Ms. D. after the birth of her third child. In contrast to Ms. D.'s capabilities at that time, Ms. D. can now manage challenging situations. She follows through with her children's appointments and is involved in their schooling. Ms. D. used to "hide and kind of disappear" when confronted with conflict. Ms. Tannenbaum testified that she has no concerns about the care A.A. and J.B. would receive if they resided full-time with Ms. D.

¶ 30                                4. *Tanya Knight*

¶ 31    Ms. Knight testified that she is a DCFS child welfare specialist assigned to Ms. D.'s family in December 2022. She conducted home visits at the residences of Mr. R. and Ms. D., and she spoke with A.A., J.B., Ms. D., Mr. R. and E.L.

¶ 32    She testified that A.A. and J.B. consistently expressed a desire to live with Ms. D. and their younger brother, E.L., because they loved them. They also wanted to maintain a relationship with Mr. R. because they loved him. She agreed that he had done "some heavy lifting raising the kids." Ms. Knight testified that she had no concerns about the well-being of A.A. and J.B. should they be returned to Ms. D.'s care. She agreed with Mr. Gonzalez that it would be in the best interests of A.A. and J.B. to discharge the guardian and return them to the care of Ms. D.

¶ 33    The trial court clarified that if it vacated the guardianship, A.A. and J. B. would be made wards of the court. The court would maintain jurisdiction to set visitation parameters, and it would not "just close the case."

¶ 34                                              5. *Edward P.*

¶ 35    Edward P. testified that he and Ms. D. have been in a relationship for seven years and they live together. During the COVID-19 pandemic, A.A. and J.B. attended remote learning sessions from Ms. D.'s home every day. They also spent several nights a week at her home. He supported Ms. D.'s request to have A.A. and J.B. live with her full-time because he "love[d] the boys." Edward P. has a teenage daughter from a prior relationship who spends part of her time at their residence. He testified that all the children get along very well and "love each other." He is active in the boys' lives. They have vacationed together, and he has attended parent-teacher conferences. Edward P. would continue to support the boys' relationship with Mr. R.

¶ 36                                              6. *Ms. D.*

¶ 37    Ms. D. testified that she has been living in the same four-bedroom house in Park Forest for five years. She lives with Edward P. and her son, E.L. If A.A. and J.B. return to her, she would take complete responsibility for their medical care, school attendance, and discipline. She would also maintain the boys' relationship with Mr. R.

¶ 38    Ms. D. testified that J.B. was doing well in school, but A.A. had some difficulty the previous school year and was suspended for behavior issues. She stated that she would start A.A. on medication if he resides with her. Ms. D. stated that she had agreed to give A.A. medication when he was with her, but the medication was provided to her only one time. She sent a text message to Mr. R. about the medication, but she never received a response.

¶ 39    Ms. D. felt comfortable communicating with Mr. R., and he had always allowed the children to visit her. She agreed that Mr. R. and his wife did the "heavy lifting" of caring for the boys for "a very long time." Ms. D. and Mr. R. have agreed on a visitation schedule, and if there is a change, they "work that out." On cross-examination, Ms. D. acknowledged that her relationship with Mr. R. was "okay" but "a little rocky."

¶ 40                                    7. *Mr. R.*

¶ 41    Mr. R. testified that he was 59 years old and worked as a semi-truck driver. His wife was Ms. D.'s aunt. He and his wife were married for 21 years, and they had three children. He testified that Ms. D. also stayed with them for a while when she was young. A.A. has lived with him since he was six months old, and J.B. has been with him since he was three years old. After his wife passed away in 2017, Mr. R. raised the boys with help from his daughter-in-law and sons when he had to work.

¶ 42    Mr. R. and his wife wanted A.A. and J.B. to have a relationship with their mother. He testified that during the pandemic, Ms. D. assisted with remote learning for the boys. They also

stayed with Ms. D. when Mr. R. contracted the virus. In early 2021, Mr. R. received a call from the school informing him that the boys were not on the computer while at Ms. D.'s house. He testified that Ms. D. "let[] them lay in the bed, then they [fell] right back to sleep." Mr. R. stated that A.A. began having problems in school "ever since we started going through what we was [*sic*] going through with [Ms. D.]." A.A. eventually transferred to a different school.

¶ 43    Mr. R. testified that he took A.A. and J.B. to their medical appointments. When they were younger, he took them skating and he taught them to ride a bicycle. He also gave money to Ms. D. for the boys and never asked her to repay him. He testified that "[a]s long as it had something to do with the boys, it was fine."

¶ 44    Mr. R. testified that he keeps track of A.A. and J.B. during the summer when he is working. He has "cameras all around the house," and each of the boys has a phone. Mr. R. stated that "[i]f they want to go outside, they gotta tell me where they're going, *** and I can see everything and I can hear everything. If they want to go out, they call me." He testified that Ms. D., his son, and his daughter-in-law live less than 15 minutes from his house.

¶ 45    Mr. R. stated that he was willing to allow A.A. and J.B. to spend more time with Ms. D., but he had concerns about her parenting. He gave an example where J.B. asked Mr. R. to drop him off in downtown Chicago, but Mr. R. would not allow it. J.B. then asked Ms. D. and he informed Mr. R. that Ms. D. would take him there. Mr. R. did not "want him to be downtown unauthorized by [himself] because [there was] too much *** going on downtown." Eventually J.B.'s aunt took him downtown and stayed with him. Another time, Ms. D. allowed J.B. to visit his cousin in Hammond, Indiana. Mr. R. later discovered that J.B. was walking around by himself. He believed that Ms. D. treated J.B. more like a friend than a son, and she "let him do what he wants to do."

Mr. R. explained that he and his wife tried "to keep them under control" because "[o]nce you lose them to the streets, it's hard to get them back."

¶ 46     On cross-examination, Mr. R. acknowledged that Ms. D. "kicked in as a mom" during the COVID-19 pandemic, and the boys stayed with her during the day and at times overnight.

¶ 47                              8. *Ms. D.'s Rebuttal Testimony*

¶ 48     Ms. D. testified that she never received calls from Mr. R. about the boys not being on their computers for remote learning. Her expectation was that A.A. and J.B. would be out of bed and sitting at their desk with the camera turned on, but she acknowledged that A.A. and J.B. would sometimes turn off their camera. Ms. D. admitted that J.B. visits his father's family in Indiana, but it was her understanding that Mr. R. communicated directly with J.B.'s father regarding those visits. She testified that J.B.'s father picks him up from Mr. R.'s home.

¶ 49                              9. *Closing Arguments*

¶ 50     The State argued that both homes were appropriate, but because A.A. and J.B. expressed their wish to live with Ms. D., the Juvenile Court Act supported her petition to discharge the guardianship. The Public Guardian adopted the State's argument. It further stated that the guardianship served its purpose in keeping the "family unit legally the same, and with the idea that maybe in the future they can come back and vacate the guardianship." It recognized, however, that "[t]his is a very complicated case. *** [Mr. R.] has done an exemplary job. The boys want a relationship with him." The Public Guardian believed Ms. D. would also protect A.A. and J.B.

¶ 51     Ms. D.'s counsel argued that she had made tremendous strides since the guardianship was entered and is now fit, willing, and able to care for A.A. and J.B. Counsel argued that, under the Probate Act, it was the guardian's burden to prove by clear and convincing evidence that it was in the children's best interest to remain with Mr. R., and he did not meet that burden. Counsel argued

that Ms. D. and Mr. R. are "not on a level playing field. If they were, no parent would ever be able to resume custody of their own children."

¶ 52     Counsel for Mr. R., however, noted that there had been no finding regarding Ms. D.'s fitness and parental abilities. Counsel argued that Mr. R and Ms. D. are not on "level playing fields" because "[w]hen the kids came into the system, *** the mother lost certain rights." He argued that Mr. R. continues to keep the children's best interest in his mind, and he wants Ms. D. to have a relationship with A.A. and J.B. Mr. R. would set aside his own needs if necessary to be a parent to A.A. and J.B. Counsel further argued that the Probate Act did not apply.

¶ 53                              10. *Trial Court's Determination*

¶ 54     The court found Mr. R. "to be an exceedingly credible witness. *** One of the more credible witnesses I've seen since being in Juvenile Court." The court found that, based on credibility and testimony, A.A. and J.B. are "much safer with [Mr. R.] than with [Ms. D.]" The court explained:

> "[T]he boys are teenagers. They want to go back to live with [Ms. D.] And I've seen
> both folks testify, and I heard from the children. And I have seen thousands of teenagers
> and represented them. And it doesn't shock me that a teenager wants to go with his ice
> cream and cake rather than broccoli and spinach. So we've got [Mr. R.] on one hand who's
> a tough guy saying, *** this is what I want. Then the teenager saying hey, wait a second. I
> don't want that. There's a little rebellion there. So they go to the ice cream and cake."

¶ 55     The trial court then addressed the best interest factors. It found that regarding the children's safety and welfare, "[Mr. R.] wins on that." Ms. D. had a slight edge on the identity factor because she is the children's mother. Mr. R. and Ms. D. were equal regarding the boys' sense of attachment, security and familiarity. Since A.A. and J.B. have been living at both Mr. R.'s house and Ms. D.'s

house, the "least disruptive" factor was also a tie. Although Ms. D. prevailed regarding the children's wishes, the court did not know about "long-term goals." Regarding the children's need for permanence, stability, and continuity of relationships with parent figures, the court found that Mr. R. has "the edge." The court found that it was "a lot closer case" than the parties portrayed.

¶ 56   The trial court reiterated that it found both Mr. R. and Ms. D. to be good parents. It further commented that:

"[Mr. R.] did enormous heavy lifting here, and *** I would appreciate [Ms. D.] coming up here and raising her right hand and saying, you know [Mr. R.] was a good parent, a tough guy. He did a good job of raising my children, and I really love and respect him for it. But right now I'm the parent and I want to step in and raise my kids. I feel there's a certain amount of lack of gratitude here for [Mr. R. and] I don't like it. And it really bothers me."

¶ 57   The trial court continued the matter for seven weeks before entering judgment. During that time, Ms. D. would have the children for 30 days and Mr. R. would have them for 12 days. The court hoped that the parties would "figure this out" and "get along." The court acknowledged that the law favors the birth parent, but at the same time it requires the court to consider the physical safety and welfare of the child.

¶ 58   On September 27, 2023, Mr. R. reported that A.A. and J.B. had spent 35 days with Ms. D. and 14 days with him. They continued to express a desire to live with Ms. D. The trial court noted:

"I interviewed the boys and *** to say they're firm one way or the other is wrong. I got it. They were very ambivalent when I spoke with them. The kids feel the mother is going to give *** them more freedom to do what they want. Honestly I think the mother manipulated them. I identify [Mr. R.] has done the heavy lifting; and now he is cast aside.

- 14 -

I'll continue the case; and all of the parties work together and come back in six months and see how things are going."

The court ordered that A.A. and J.B. spend two-thirds of their time with Ms. D. and one-third with Mr. R. The case was continued to March 19, 2024 for another hearing.

¶ 59                    B. *Second Hearing on Ms. D.'s Petition to Discharge*

¶ 60    At the hearing, Ms. Knight testified that A.A. and J.B. spent the majority of their time with Ms. D. and "the visits are going well." A.A. now attends an alternative school and is enrolled in counseling.

¶ 61    Ms. D. testified that A.A. and J.B. had been staying with her four or five days a week. She began a new job in February which requires her to work early in the morning. As a result, the visitation schedule had to change because she could not arrange for the children's school transportation since she is not the legal guardian. A.A. attends an alternative school and also has a plan due to a diagnosis of ADHD. She and Mr. R. attend A.A.'s meetings together. Ms. D. testified that her relationship with Mr. R. was "[p]retty good." A.A. started therapy at Catholic Charities and his behavior at school has improved. His grades have also improved. J.B. has expressed an interest in attending college or a trade school.

¶ 62    Mr. R. testified that A.A. has been doing well since he changed schools. His house is within walking distance to the boys' school. He described A.A.'s grades as "excellent." Mr. R. and Ms. D. discussed hiring a tutor for A.A. He testified that the visitation schedule has been going well, and that Ms. D. was "doing a good job with the boys." Due to her new job, Ms. D. now drops off the children at Mr. R.'s house around 5 or 5:30 a.m., they go back to bed, and then he wakes them up for school. Mr. R. testified that A.A. was prescribed Ritalin about a month ago but he forgot to inform Ms. D. of this fact. He stated that Ms. D. has been making a lot of the medical appointments

for the children. Mr. R. testified that both children like going to Ms. D.'s house but that A.A. will "start missing me." A.A. and J.B. "like going back and forth" between the houses.

¶ 63    The Public Guardian reported that J.B. expressed an interest in returning to Ms. D. A.A. "sort of expressed an interest in sharing a relationship with both parties, but a slight preference for [Ms. D.], to live there. That has been pretty consistent." Both boys want to maintain a relationship with everyone.

¶ 64    The trial court noted that the children "clearly loved both" Ms. D. and Mr. R. The parties "have been working well together. I don't see any reason to change anything now, particularly in light of the fact that the financial resources the State is giving will be lost if I were to send someone home." The trial court stated that J.B. will be 18 years old in November and at that time, "[h]e can stay where he wants to." Regarding A.A., "everything seems to be working out okay. And I'm loathe[ ] to change it." The court continued the case for six months to give Mr. R. and Ms. D. time "to figure things out." The court also wanted another interview with A.A. and J.B.

¶ 65                    C. *Final Hearing on Ms. D.'s Petition*

¶ 66    At the hearing on August 7, 2024, Ms. D.'s counsel informed the court that Ms. D. could not be present because of work. The trial court asked J.B. and A.A. questions. J.B. stated that he was a senior in high school and doing well in school. He wanted to "do" real estate, or sell houses, after graduation. A.A. stated that he was a freshman in high school. The trial court did not ask them whether they wanted to live with Mr. R. or Ms. D..

¶ 67    After the hearing, the trial court denied the petition because it saw "no reason to do anything, just leave everything the same." The court reasoned:

"[T]he boys are old and [they're] intelligent. And it seems to me that [Mr. R.] and [Ms. D.] have a working relationship, and I'm just going to stay out of it and not grant the petition.

I think [Mr. R.] has done a good job. When I grew up on the south side, the highest compliment we could pay to a guy is to say he's one tough guy. And that's more than just being physically tough. It means being spiritually and mentally tough. And I find [Mr. R.] to be a tough guy. So I'm just discharging the petition. Good luck to everybody."

When pressed by Ms. D.'s counsel to provide a legal basis for its decision, the trial court stated: "I don't think there's any grounds to grant it. I think [Mr. R.] has done a good job." The court explained:

"I don't think [changing the guardianship situation] is in their best interest. I don't want to assassinate characters here, and it's not my job.

I think it's in their best interest to stay with [Mr. R.] He has a working relationship with their mother, and I trust him. And he's done a good job, and that's the ruling."

¶ 68 The trial court entered a written order stating that the "[c]ases remain closed per the October 11, 2013 closure orders." Ms. D. filed this appeal.[2]

¶ 69                                                    II. ANALYSIS

---

[2]   J.B. has reached 18 years of age and therefore the terms of the private guardianship no longer apply to him. However, we include J.B. in our analysis since Ms. D.'s petition and the evidence at the hearing included J.B.

¶ 70    Before considering the merits of Ms. D.'s appeal, we address the Public Guardian's motion to strike footnote 11 and portions of Ms. D.'s reply brief, which we had taken with the case. We note that in footnote 11, as well as other footnotes in the reply brief, Ms. D. sets forth substantive arguments regarding the Public Guardian's statutory duty. The supreme court rules provide that the use of footnotes is "discouraged." Ill. S. Ct. R. 341(a) (eff. Feb. 6, 2013). Furthermore, courts may strike substantive arguments made in footnotes. *Benz v. Department of Children and Family Services*, 2015 IL App (1st) 130414, ¶ 27. Although we decline to strike portions of Ms. D.'s reply brief, we will disregard any inappropriate or unsupported material, as well as any substantive arguments contained only in footnotes. See *id*.

¶ 71    Ms. D. contends that the trial court erred when it failed to follow the proper standard set forth in the Probate Act for terminating the guardianship. Instead, the court erroneously applied the best interest standard pursuant to the Juvenile Court Act when it denied her petition.

¶ 72    This issue requires us to construe the provisions of both statutes. Our primary objective in construing a statute is to ascertain and give effect to legislative intent. *In re Jarquan B.*, 2017 IL 121483, ¶ 22. The best indicator of that intent is the language of the statute, given its plain and ordinary meaning. *Id*. If the language is clear and unambiguous, we must give effect to the statute's plain meaning without resorting to other aids of statutory construction. *Id*. We also follow the fundamental principle that statutes must be read as a whole and not as isolated provisions. *In re Shelby R.*, 2013 IL 114994, ¶ 32. We review an issue of statutory construction *de novo*. *Id*. ¶ 13.

¶ 73    The following provisions of the Probate Act set forth a process for appointment of a guardian and termination of the guardianship:

"§ 11-5. Appointment of guardian.

(a) Upon the filing of a petition for the appointment of a guardian or on its own motion,

the court may appoint a guardian \*\*\* of a minor \*\*\* as the court finds to be in the best interest of the minor or minors.

\* \* \*

§ 11-14.1. Revocation of letters.

\* \* \*

(b) Upon the filing of a petition by a minor's living, adoptive, or adjudicated parent whose parental rights have not been terminated, the court shall discharge the guardian and terminate the guardianship if the parent establishes, by a preponderance of the evidence, that a material change in the circumstances of the minor or the parent has occurred since the entry of the order appointing the guardian; unless the guardian establishes, by clear and convincing evidence, that termination of the guardianship would not be in the best interests of the minor. In determining the minor's best interests, the court shall consider all relevant factors including:

(1) The interaction and interrelationship of the minor with the parent and members of the parent's household.

(2) The ability of the parent to provide a safe, nurturing environment for the minor.

(3) The relative stability of the parties and the minor.

(4) The minor's adjustment to his or her home, school, and community, including the length of time that the minor has lived with the parent and the guardian.

(5) The nature and extent of visitation between the parent and the minor and the guardian's ability and willingness to facilitate visitation." 755 ILCS 5/11-5, 11-14.1 (West 2022).

¶ 74     Ms. D. argues that because Mr. R. was appointed the guardian of A.A. and J.B. pursuant to the Probate Act, the trial court should have followed the procedure and best interest standard set forth in section 11-14.1(b) when ruling on her petition to discharge the guardian. She argues that the clear and convincing standard in section 11-14.1(b) is necessary to protect her constitutional rights as a parent. As support, she cites *In re M.S.*, 2025 IL App (1st) 241925, *In re T.P.S.*, 2011 IL App (5th) 100617, and *In re Custody of Townsend*, 86 Ill. 2d 502 (1981).

¶ 75     In *M.S.*, the minor was adjudicated abused and neglected by her mother under section 2-3(1)(a), (b) of the Juvenile Court Act. *M.S.*, 2025 IL App (1st) 241925, ¶ 6. The minor was placed in the custody of her maternal aunt, and a permanency order was entered with the goal of private guardianship. At the time, the minor's biological father was unknown. *Id.* ¶ 8. Six months later, Benjamin B. appeared in court and DNA testing was ordered. After another hearing, the trial court again entered a permanency goal of private guardianship, finding that the minor had been with her foster mother since she was four months old and the foster mother was willing to be her guardian. The court also entered an order stating that Benjamin was the minor's biological father. *Id.* ¶ 10. Benjamin subsequently filed a petition to change the permanency goal of guardianship to return home. He alleged that no allegations regarding his parentage had been made against him, and he did not know earlier that the minor was his child. *Id.* ¶ 13.

¶ 76     Meanwhile, DCFS had filed a petition to appoint the foster mother as the minor's guardian pursuant to the Probate Act. DCFS also filed a motion to vacate DCFS guardianship, terminate wardship, and close the case. *Id.* ¶ 21. After a hearing on the petition, the trial court granted DCFS's petition and denied Benjamin's petition. *Id.* ¶ 28. Benjamin appealed.

¶ 77     On appeal, Benjamin argued that the trial court lacked jurisdiction to grant DCFS's petition pursuant to the Probate Act without first finding that he was unwilling and unable to care for his

daughter. *Id*. ¶ 33. The State and the Public Guardian, however, contended that the Juvenile Court Act was applicable to the guardianship proceedings below. *Id*. ¶ 34. This court determined that because the petition for private guardianship was filed pursuant to the Probate Act, and in granting the petition the trial court explicitly cited the Probate Act, the Probate Act controlled the analysis on appeal. *Id*.

¶ 78    *M.S.* does not control the outcome of this case. The father in *M.S.* filed an appeal from the trial court's decision to grant DCFS's petition to appoint a private guardian pursuant to the Probate Act. Accordingly, the issue in *M.S.* was whether the private guardian was properly appointed under that statute. Here, Mr. and Mrs. R. had been appointed as private guardians of A.A. and J.B. pursuant to an order entered on October 11, 2013. That order also terminated state wardship of the minors and closed the cases. No appeal from that judgment was filed, and the cases remained closed when Ms. D. filed her petition to discharge the private guardian on June 1, 2022. The issue before the trial court below was not whether the appointment of Mr. and Mrs. R. as private guardians pursuant to the Probate Act was proper, as was the case in *M.S.* Rather, the trial court considered whether to grant Ms. D.'s petition to discharge Mr. R. as the private guardian after he had served in that capacity for over ten years. *M.S.* does not address whether the Probate Act should apply under these circumstances.

¶ 79    Ms. D. cites *In re T.P.S.* and *Townsend* to support her contention that the trial court should have applied a clear and convincing standard in determining best interests in this case, which section 11-14.1(b) provides. In neither of these cases, however, was the guardian appointed after a finding of parental unfitness in a juvenile court proceeding. Therefore, the nonparent guardian who sought to retain custody in those cases had to rebut the well-established presumption that

parents have a superior right to the care and custody of their children. See *In re T.P.S.*, 2011 IL App (5th) 100617, ¶ 14; *Townsend*, 86 Ill. 2d at 508. These cases are inapposite.

¶ 80 We agree with appellees and the trial court that the best interest standard pursuant to the Juvenile Court Act applied to Ms. D.'s petition. Although the Juvenile Court Act does not contain a specific provision for terminating a guardianship, we find that the statute provides the proper framework for addressing Ms. D.'s petition.

¶ 81 "The Juvenile Court Act 'establishes an elaborate and carefully tailored scheme to effect a balance between the constitutional rights of parents and the statutorily-created rights of children to health, safety, and protection.' " *In re Julieanna M*., 2018 IL App (1st) 172972, ¶ 25, quoting *In re O.S.*, 364 Ill. App. 3d 628, 638 (2006). Relevant here, section 2-28(2) provides that once a permanency goal has been achieved and the minor is placed in substitute care, the case is reviewable by the court every six months "unless the minor is placed in the guardianship of a suitable relative or other person and the court determines that further monitoring by the court does not further the health, safety, or best interest of the child and that this is a stable permanent placement." 705 ILCS 405/2-28(2) (West 2024).

¶ 82 Section 2-31(2) provides that:

"Whenever the court determines, and makes written factual findings, that health, safety, and the best interests of the minor and the public no longer require the wardship of the court, the court shall order the wardship terminated and all proceedings under this Act respecting that minor finally closed and discharged." 705 ILCS 405/2-31(2) (West 2024).

After a case has been closed, section 2-33(1) provides that:

"(1) Any time prior to a minor's 18th birthday, pursuant to a supplemental petition filed under this Section, the court may reinstate wardship and open a previously closed case when:

(a) wardship and guardianship under the Juvenile Court Act of 1987 was vacated in conjunction with the appointment of a private guardian under the Probate Act of 1975;

(b) the minor is not presently a ward of the court under Article II of this Act nor is there a petition for adjudication of wardship pending on behalf of the minor; and

(c) it is in the minor's best interest that wardship be reinstated." 705 ILCS 405/2-33(1)(a)-(c) (West 2024).

Once wardship has been reinstated, section 2-23(1) provides that

"(1) The following kinds of orders of disposition may be made in respect of wards of the court:

(a) A minor found to be neglected or abused under Section 2-3 or dependent under Section 2-4 may be (1) continued in the custody of the minor's parents, guardian or legal custodian; (2) placed in accordance with Section 2-27; (3) restored to the custody of the parent, parents, guardian, or legal custodian ***; or (4) ordered partially or completely emancipated in accordance with the provisions of the Emancipation of Minors Act.

* * *

However, in any case in which a minor is found by the court to be neglected or abused under Section 2-3 of this Act, custody of the minor shall not be restored to any parent, guardian or legal custodian whose acts or omissions or both have been

identified *** as forming the basis for the court's finding of abuse or neglect, until such time as a hearing is held on the issue of the best interests of the minor and the fitness of such parent, guardian or legal custodian to care for the minor without endangering the minor's health or safety, and the court enters an order that such parent, guardian or legal custodian is fit to care for the minor." 705 ILCS 405/2-23(1) (West 2024).

¶ 83    After finding that Ms. D. was unfit to care for A.A. and J.B., the trial court set private guardianship as the permanency goal. On October 11, 2013, pursuant to motions filed by DCFS, the court entered orders appointing foster parents Mr. and Mrs. R. as the private guardians for A.A. and J.B. The court further found that the children were "living in a stable home" and it was in their best interest "to have no further monitoring by the court." The trial court thus vacated its wardship of A.A. and J.B. pursuant to the Juvenile Court Act. Since the permanency goal was achieved, and A.A. and J.B. had a stable placement with Mr. and Mrs. R., their cases were closed. See 705 ILCS 405/2-31(2) (West 2024). The cases had been closed for almost ten years when Ms. D. filed her petition to discharge the private guardian on June 1, 2022. The trial court's order denying Ms. D.'s petition recognized the closures by stating that the "[c]ases remain closed per the October 11, 2013 closure orders."

¶ 84    It follows that, because the cases under which the private guardian was appointed had closed, Ms. D. must file a supplemental petition in the same proceeding to "reinstate wardship and open a previously closed case" before the guardian may be discharged. *Id.* § 2-33(1). Ms. D. acknowledges as much in her brief. Once wardship is reinstated with the court, the court may then decide whether to restore custody of A.A. and J.B. to Ms. D. *Id.* § 2-23(1)(a).

¶ 85    Additionally, A.A. and J.B. had been adjudicated neglected under sections 405/2-3(1)(a) and 2-3(1)(b) of the Juvenile Court Act. Therefore, before custody of A.A. and J.B. can be restored to Ms. D., the court must first hold a hearing on the issue of the best interests of the minors and the fitness of Ms. D. *Id*. § 2-23(1). The court must also enter an order finding that Ms. D. "is fit to care for the minor." *Id.* Section 11-14.1(b) of the Probate Act does not address the restoration of custody to the parent when a minor had been adjudicated abused or neglected under the Juvenile Court Act. Rather, it applies generally to petitions filed by a parent "whose parental rights have not been terminated." 755 ILCS 5/11-14.1(b) (West 2024). It is a well-established rule of statutory construction that when two statutes cover the same subject, the specific governs the general. *Kloeppel v. Champaign County Board*, 2022 IL 127997, ¶ 22.

¶ 86    For these reasons, we find section 2-33 of the Juvenile Court Act applicable to Ms. D.'s petition, as opposed to section 11-14.1 of the Probate Act. Although Ms. D. filed her petition pursuant to the Probate Act, the trial court properly considered her petition as a section 2-33 petition to reinstate wardship and reopen a previously closed case under the Juvenile Court Act. See *In re Haley D.*, 2011 IL 110886, ¶ 67 (finding that the character of the pleading determines its content, and when considering a party's request for relief, "courts should look to what the pleading contains, not what it is called"). We therefore review the trial court's decision to deny Ms. D.'s petition to reinstate wardship and reopen the cases so that she may regain custody of A.A. and J.B.

¶ 87    Section 2-33 provides that wardship may be reinstated and a previously closed case reopened when the following are satisfied: (1) wardship and guardianship under the Juvenile Court Act "was vacated in conjunction with the appointment of a private guardian" under the Probate Act, (2) the minor is not presently a ward of the court, and (3) it is in the minor's best interest that wardship be reinstated. 705 ILCS 405/2-33(1)(a)-(c) (West 2024). All three conditions must be

satisfied for the court to reinstate wardship. *In re L.W.*, 2018 IL App (3d) 170405, ¶ 17. Here, the first two elements have been satisfied. The issue is whether the trial court properly found that it was not in A.A.'s and J.B.'s best interest to reinstate wardship.

¶ 88    As an initial matter, Ms. D. questions the applicable burden of proof as well as the party who bears it. She argues that Mr. R., as the guardian, bears the burden of proving by clear and convincing evidence that it was not in the children's best interest to reopen their case and restore custody to Ms. D. She contends that the clear and convincing evidence standard is necessary to protect her constitutional rights as a parent.

¶ 89    We acknowledge that before parental rights can be terminated under the Juvenile Court Act, the court must first find by clear and convincing evidence that the parent is unfit to care for the minor. See 705 ILCS 405/2-29 (West 2024); *In re C.L.*, 2018 IL App (1st) 180577, ¶ 41. "A clear and convincing standard underscores the importance of the parent's interest and the fact that such interest will not be extinguished lightly." *In re D.T.*, 212 Ill. 2d 347, 364 (2004).

¶ 90    However, following a finding of parental unfitness, the focus shifts to the child. Accordingly, at a best interest hearing to determine a proper disposition for the child, the parent's interest must yield to the child's interest in a stable, loving home life. *Id.* Our supreme court explained that a "stricter clear and convincing burden of proof" on the State at a best interest hearing would operate to the child's detriment because an erroneous finding would "deprive the child of the opportunity for permanency." *Id.* at 365. The court held that "due process does not require imposition of a clear and convincing standard of proof at a best-interests hearing, and that the preponderance standard of proof adequately ensures the level of certainty about the court's factual conclusions necessary to satisfy due process." *Id.* at 366. Under the preponderance of the

evidence standard, the State must only present evidence that renders the fact at issue more likely than not. *In re K.P.*, 2020 IL App (3d) 190709, ¶ 41.

¶ 91    In this case, Ms. D. was found unfit pursuant to sections 405/2-3(1)(a) and 2-3(1)(b) of the Juvenile Court Act. The trial court has made no ruling to contradict that initial finding.[3] Therefore, we find, as the trial court found, that the preponderance of the evidence standard applies to the best interest determination here.

¶ 92    The Juvenile Court Act establishes the procedures courts must follow when determining whether a minor should be removed from a parent's custody and made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. "In any proceeding initiated pursuant to the [Juvenile Court Act], including an adjudication of wardship, the paramount consideration is the best interests of the child." *Id*. We will not disturb the trial court's decision on wardship unless it is against the manifest weight of the evidence. *In re William H.*, 407 Ill. App. 3d 858, 871 (2011). A finding is against the manifest weight of the evidence if the record establishes that the opposite conclusion is clearly apparent. *In re N.G.*, 2018 IL 121939, ¶ 29.

¶ 93    The Juvenile Court Act provides that "[w]henever a "best interest" determination is required, the following factors shall be considered in the context of the child's age and developmental needs:

(a) the physical safety and welfare of the child, including food, shelter, health, and clothing;

(b) the development of the child's identity;

(c) the child's background and ties, including familial, cultural, and religious;

---

[3]    Due to our resolution of this issue, we need not address Ms. D.'s argument that the Juvenile Court Act is unconstitutional to the extent that it gives no deference to a *fit* parent's superior parental rights when determining whether to terminate a guardianship. See *People v. Hampton*, 225 Ill. 2d 238, 244 (2007) (emphasizing that "[c]onstitutional issues should be addressed only if necessary to decide a case").

(d) the child's sense of attachments, including:

(i) where the child actually feels love, attachment, and a sense of being valued (as opposed to where adults believe the child should feel such love, attachment, and sense of being valued);

(ii) the child's sense of security;

(iii) the child's sense of familiarity;

(iv) continuity of affection for the child;

(v) the least disruptive placement alternative for the child;

(e) the child's wishes and long-term goals, including the child's wishes regarding available permanency options and the child's wishes regarding maintaining connections with parents, siblings, and other relatives;

(f) the child's community ties, including church, school, and friends;

(g) the child's need for permanence which includes the child's need for stability and continuity of relationships with parent figures, siblings, and other relatives;

(h) the uniqueness of every family and child;

(i) the risks attendant to entering and being in substitute care; and

(j) the preferences of the persons available to care for the child, including willingness to provide permanency to the child, either through subsidized guardianship or through adoption." 705 ILCS 405/1-4.05 (West 2024).

No single factor is dispositive. *In re S.K.B.*, 2015 IL App (1st) 151249, ¶ 48. Also, the trial court is not required to mention each factor when making its determination and need not articulate any particular rationale for its decision. *In re Deandre D.*, 405 Ill. App. 3d 945, 954-55 (2010). A

reviewing court need not rely on any basis used by the trial court in affirming the trial court's judgment. *Id*. at 955.

¶ 94    The trial court held multiple hearings over a timespan of almost one year. The evidence at the hearings established that A.A. and J.B. were loved and cared for by Mr. and Mrs. R., and that they maintained a good relationship with Ms. D. while under Mr. R.'s guardianship. Both parties agreed to work together to ensure proper care for A.A. and J.B., and the evidence indicated that they worked well together in that regard.

¶ 95    Addressing some of the best interest factors, the trial court found that it was a close case. The court acknowledged that the children expressed a desire to live with Ms. D. but found that Mr. R. had "the edge" regarding their need for permanence, stability, and continuity with parental figures. The trial court also found Mr. R. to be "an exceedingly credible witness." It noted that A.A. and J.B. are now teenagers who display typical characteristics of "rebellion." As a result, the court concluded that A.A. and J.B. are "much safer with [Mr. R.]," who the court viewed as stricter with the boys.

¶ 96    The trial court found that A.A. and J.B. loved both Mr. R. and Ms. D. and wanted to maintain a relationship with "everyone." The court did not believe that changing the situation of A.A. and J.B. would be in their best interest. In denying the petition, the court explained that it did not want to interfere with a situation that was working well for all of the parties. The court believed Mr. R. was a "tough guy," physically, mentally and spiritually "tough." The court found that it was in the children's "best interest to stay with [Mr. R.] He has a working relationship with their mother, and I trust him. And he's done a good job, and that's the ruling." The court's written order stated that the cases "remain closed per the October 11, 2013 closure orders."

¶ 97    The record shows that the trial court carefully considered the evidence when determining what was in the best interests of A.A. and J.B. The court interviewed A.A. and J.B. at least three times, and at the final hearing, it questioned them again. The matter was continued multiple times to see whether Mr. R. and Ms. D. could come to a mutually acceptable resolution without interference by the court. Although the court acknowledged that A.A. and J.B. wished to live with Ms. D., it found that as teenagers, they would benefit from Mr. R.'s discipline and guidance, as they have done for more than 10 years. Although the Public Guardian and Mr. Gonzalez supported Ms. D.'s petition, they acknowledged that "it's a very complicated case," and there would be growing pains with Ms. D. having custody. Mr. Gonzalez testified that if Ms. D. becomes "their central parent and disciplinarian[,] that will come with some testing because they are teenager[s]." The court saw no reason to disrupt the stable placement of A.A. and J.B. when "everything seems to be working out okay," and Mr. R. and Ms. D. "have been working well together." We cannot say that the opposite conclusion is clearly apparent.

¶ 98    Ms. D., however, argues that the trial court's determination was against the manifest weight of the evidence where it "improperly faulted [her] for not expressing sufficient gratitude to Mr. R.," and "was overly fixated on the laudable way in which Mr. R. had raised J.B. and A.A." She argues that in doing so, the trial court elevated its own values regarding the parties' parenting styles at the expense of evidence favoring termination of the guardianship. Ms. D. also questions whether the trial court properly recalled A.A.'s statement, where it commented that A.A. "leans a little bit more towards R. But he wants to stay with mom." Ms. D. contends that this "hindsight interpretation" is not supported by the record where other evidence consistently showed that A.A. and J.B. wished to live with Ms. D..

¶ 99 The record shows that the trial court found Mr. R. to be an "exceedingly credible" witness. Since the trial court is in a superior position to assess the credibility of witnesses, and weigh the evidence accordingly, we will not overturn the court's findings merely because we may have reached a different result. *In re April C.*, 326 Ill. App. 3d 225, 238 (2001). Also, in determining whether the trial court's finding was against the manifest weight of the evidence, we review the entire record to ascertain whether the opposite result was clearly apparent. *Id.* Reviewing the trial court's reasoning throughout the proceedings, it is apparent that the court's decision was not primarily based on its sense of injustice on Mr. R.'s behalf. Instead, the court believed that it was in the children's best interests to remain under the private guardianship of Mr. R., rather than disrupt that stability by granting Ms. D.'s petition and reinstating wardship with the court. As the trial court noted, if it were to grant the petition, Ms. D. would not automatically regain custody of A.A. and J.B. They would be made wards of the court, and the court would first need to hold a disposition hearing. See 705 ILCS 405/2-33(1)(a)-(c); 2-23(1) (West 2024). The trial court's comments did not detract from its determination that it was in A.A.'s and J.B.'s best interest to keep their cases closed and continue Mr. R.'s guardianship.

¶ 100 The trial court's finding was not against the manifest weight of the evidence where the record provides sufficient support for its decision. We therefore affirm the court's determination to deny Ms. D.'s petition.

¶ 101 III. CONCLUSION

¶ 102 For the foregoing reasons, we affirm the judgment of the circuit court.

¶ 103 Affirmed.

*In the Interest of J.B. and A.A.*, **2025 IL App (1st) 241779**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, Nos. 2010 JA 00562, 2010 JA 00563; the Hon. Patrick T. Murphy, Judge, presiding. |
| **Attorneys for Appellant:** | Colleen Connolly, Josephine Schulte, Melissa Staas, Leah Yarris, of Legal Aid Chicago, all of Chicago, for appellant. |
| **Attorneys for Appellees:** | Peter Sullivan, of Attorney Sullivan & Associates, LLC, of Chicago, for appellee Anthony R. |
| | Charles P. Golbert, Kass A. Plain, and Carrie Fung, of the Office of the Cook County Public Guardian, all of Chicago, for appellee minors. |
| | John Nowak, Gina DiVito, and Marina C. Para, Assistant States Attorneys of the Office of the State's Attorney of Cook County, all of Chicago, for appellee the People of the State of Illinois. |